Filed 2/21/14;pub. & mod. order 3/2/414 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ELAINE M. PAULUS et al., | B246505 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC437739) |
| v. | |
| CRANE CO., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge. Affirmed.

K&L Gates, Geoffrey M. Davis, Nicholas P. Vari and Michael J. Ross for Defendant and Appellant.

Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiffs and Respondents.

Plaintiffs' decedent, William Paulus, died from mesothelioma caused by asbestos exposure. After trial, a jury found defendant and respondent Crane Co. 10% responsible for plaintiffs' damages. Crane appeals, arguing: (1) plaintiffs failed to introduce expert testimony that Crane's asbestos *alone* (as opposed to acting in combination with others' asbestos) constituted a substantial factor in the development of decedent's mesothelioma; and (2) the trial court erred in not reducing the damages awarded against it to account for settlements plaintiffs *could* obtain from other potentially liable parties' bankruptcy trusts. We reject both arguments and affirm.

## *PROCEDURAL BACKGROUND*

Plaintiffs Elaine Margie Paulus, individually and as personal representative of the Estate of William Paulus; Dee Anne Walker; Gregory Paulus and Mark Paulus[1] brought a wrongful death and survival action against dozens of defendants, seeking recovery in negligence and strict liability. Plaintiffs settled with most of the defendants; by the time of trial, only three defendants remained; by the time the case was given to the jury, only Crane remained. Decedent had been a commercial plumber; Crane was a valve manufacturer. Plaintiffs alleged Crane was partially responsible for decedent's mesothelioma due to decedent's work with Crane valves, which, as we shall discuss, often involved work with Crane asbestos gaskets.

---

[1] Elaine Margie Paulus was decedent's wife; the other three plaintiffs were his children.

The jury concluded Crane was negligent and Crane's negligence was a substantial factor in causing harm to decedent.[2] The jury concluded that the plaintiffs' economic damages were $398,635[3] and their non-economic damages were $6,500,000. When asked to allocate liability among 46 different entities, the jury allocated 10% of the fault to Crane.[4]

Plaintiffs requested entry of judgment on the special verdict. Plaintiffs, who had settled with other defendants for a total of $5,150,000, proposed judgment in an amount which accounted for those settlement proceeds.[5] Crane filed an opposition, arguing that the plaintiffs' proposed judgment did not account for credits due Crane "from additional monies that plaintiffs will recover or be permitted to recover in the future as a result of the same claims made in this action." Specifically, Crane argued that plaintiffs would be able to recover funds from asbestos bankruptcy trusts. The trial court, which had not received Crane's opposition, entered judgment as requested by plaintiffs. Upon receiving the opposition, the court set the matter for hearing.

In the meantime, Crane filed a motion for judgment notwithstanding the verdict. Crane's motion argued that plaintiffs had failed to introduce sufficient expert testimony

---

[2]    The jury also made findings against Crane on the theories of strict liability and failure to warn.

[3]    The parties had stipulated to this number.

[4]    The jury concluded that five entities were not responsible at all. Each of the other entities was assigned a percentage of fault ranging from 0.125% to 20%.

[5]    There was, however, a mathematical error in plaintiffs' calculations. Plaintiffs would ultimately concede the error.

3

that exposure to Crane's asbestos constituted a substantial factor in the development of decedent's mesothelioma.

At the hearing on Crane's opposition to plaintiffs' request to enter judgment, the trial court rejected Crane's argument that some setoff should be made for amounts plaintiffs could recover from asbestos bankruptcy trusts. The court concluded that any recovery from such trusts was wholly speculative. The court further stated that it had no authority to direct plaintiffs to report on, and account for, any future recoveries.[6] It therefore rejected Crane's opposition. The court did, however, correct, nunc pro tunc, a mathematical error in the judgment. Judgment was entered against Crane for $99,935 in economic damages and $650,000 in noneconomic damages.

The hearing on Crane's motion for judgment notwithstanding the verdict occurred shortly thereafter. Crane conceded that it was not asserting that there was an insufficient factual basis for the jury's verdict against it; Crane was simply arguing that there was no expert testimony supporting the conclusion that Crane's asbestos *alone* constituted a substantial factor in causing decedent's mesothelioma. The court denied the motion, concluding that sufficient evidence existed to support the jury's conclusion that Crane's asbestos was a substantial factor. Crane filed a timely notice of appeal.

## *FACTUAL BACKGROUND*

It is undisputed that decedent died from malignant mesothelioma. It is also undisputed that the mesothelioma was caused by asbestos exposure. The dispute, at

---

[6] Crane agreed that no law existed supporting the result that it sought.

trial, was over which entities were responsible for that mesothelioma exposure, and in what amounts.

The evidence showed that decedent's greatest, most toxic, exposure to asbestos was in the form of asbestos-cement pipe. Indeed, the jury allocated 80% of the liability in this case to the four entities involved with asbestos-cement pipe. We are here concerned with the relatively smaller exposures decedent suffered in connection with valve work.

The exposures occurred in two ways. First, when decedent was attaching valves to pipe in most situations, decedent simply welded the valves. However, when working in a boiler or pipe room, he could not weld. In those situations, the valves were attached with flanges. It was necessary to use gaskets to make the attachments water-tight. The valves did not come with flange gaskets; the plumbers would make them. They had sheets of gasket material from which they would punch out gaskets. There were two types of gasket material decedent used almost exclusively: Cranite, which was distributed by Crane; and Garlock, which was not. Cranite was 75 to 85 percent asbestos. When punching a new gasket out of Cranite, asbestos would be freed into the environment, and decedent inhaled it.

The second type of exposure relating to valve work occurred when there was a leak in a valve, requiring decedent to open the valve to repair it. Upon opening the valve, decedent would be required to clean it of old gasket materials, and install a new gasket. Decedent would remove the worn out gasket by scraping it with a piece of threaded rod. This process released asbestos into the environment, and decedent inhaled

5

it.  Gasket removal involves not the flange gasket on the outside of the valve, but a bonnet gasket *inside* the valve.  Bonnet gaskets are unique to the valve; a plumber cannot simply make a bonnet gasket out of Cranite as he or she would a flange gasket.  Crane valves (with bonnets) would come with asbestos bonnet gaskets pre-installed.  Crane also sold asbestos bonnet gaskets as replacement parts,  but when a plumber encountered a replacement bonnet gasket inside a Crane valve, the plumber could not be certain whether the replacement gasket came from Crane or another supplier.  It cannot be disputed, however, that decedent removed some originally-installed bonnet gaskets from Crane valves, thereby being exposed to asbestos from the Crane bonnet gaskets.

There was also evidence that, when decedent worked on Crane valves, the valves may have been insulated with asbestos materials, which were released when decedent cut into them.  However, it is undisputed that Crane was not responsible for any asbestos insulation.

*ISSUES ON APPEAL*

Crane raises two contentions on appeal:  first, the trial court should have granted Crane's motion for judgment notwithstanding the verdict because plaintiffs' expert testimony was insufficient to establish that decedent's work with Cranite and Crane bonnet gaskets – as opposed to decedent's work with Cranite and Crane valves (with any manufacturer's gaskets) – constituted a substantial factor in causing his mesothelioma; second, that the trial court erred in not reducing the judgment against Crane to account for settlements plaintiffs may in the future obtain from asbestos bankruptcy trusts.

6

## DISCUSSION

1. *Standard of Review*

"[An] appeal from the trial court's denial of [a] motion for judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence to support the jury's verdict and the trial court's decision. The standard of review is essentially the same as when the trial court has granted the motion. [¶] ' " . . . [T]he trial court may not weigh the evidence or judge the credibility of the witnesses, as it may do on a motion for a new trial, but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. Such order may be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is no evidence sufficiently substantial to support the verdict. [¶] On an appeal from the judgment for defendant notwithstanding the verdict, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict. . . . " ' " (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.)

2. *Law of Causation*

A plaintiff in an asbestos case must establish "that exposure to the defendant's asbestos products was, in reasonable medical probability, a substantial factor in causing or contributing to his risk of developing cancer." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 957-958.) "[P]laintiffs may prove causation in asbestos-related

7

cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth."[7] (*Id*. at pp. 976-977, fn. omitted.) "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Id*. at p. 978.)

"Many factors are relevant in assessing the medical probability that an exposure contributed to plaintiff's asbestos disease. Frequency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff are certainly relevant, although these considerations should not be determinative in every case. [Citation.] Additional factors may also be significant in individual cases, such as the type of asbestos product to which plaintiff was exposed, the type of injury suffered by plaintiff, and other possible sources of plaintiff's injury. [Citations.] 'Ultimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case.' [Citation.]" (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1416-1417.)

---

[7] Throughout Crane's briefing, it misstates this standard. The plaintiff must prove that the defendant's asbestos products were a substantial factor in contributing to the *risk* of developing mesothelioma, not the mesothelioma itself. Crane, however, repeatedly argues that plaintiffs were required to establish that Crane's products were a substantial factor "in causing [decedent's] disease."

8

Although proof must be made to a reasonable medical probability, a medical doctor need not expressly link together the evidence of substantial factor causation. (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 675.) Nor is there a requirement that "specific words must be recited by [plaintiffs'] expert." (*Ibid.*)

The connection, however, must be made between the defendant's asbestos products and the risk of developing mesothelioma suffered by the decedent. A defendant may not be liable for the harm caused by another manufacturer's asbestos simply because it was foreseeable that the other manufacturer's asbestos would be used in conjunction with the defendant's product. (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 342.) Or, putting it more concretely, Crane cannot be held liable for decedent's exposure to replacement asbestos bonnet gaskets used in its valves, if the bonnet gaskets were made by another manufacturer. (*Ibid.*) Nor can Crane be held liable for another manufacturer's asbestos insulation used on or near its valves.

3.      *Plaintiffs' Evidence was Sufficient*

The dispute in this case centers on one word of testimony given by Dr. Edwin Holstein, plaintiffs' expert in preventive medicine and occupation medicine. Dr. Holstein testified that his opinions were within a reasonable degree of scientific and medical certainty. He testified that his opinion was that "Cranite and Crane Co. *valve* work was a substantial factor in causing [decedent's] mesothelioma." (Emphasis added.) He similarly testified that, if decedent's disease had been lung cancer,[8]

---

[8]      Another defendant, which was dismissed from the case during trial, had taken the position that decedent died of lung cancer, not mesothelioma.

9

decedent's "exposures from Cranite gaskets and Crane *valves* were a substantial factor in the development" of decedent's lung cancer. (Italics added.) In both places, Dr. Holstein's testimony referred the exposures from Crane valves, which, according to Crane, could have encompassed exposures from non-Crane replacement bonnet gaskets and non-Crane insulation. In other words, Crane argues that Dr. Holstein did not testify that decedent's exposures to Cranite and Crane *gaskets* alone constituted a substantial factor, but included non-Crane asbestos in the exposures which cumulatively constituted a substantial factor causing decedent's mesothelioma. We disagree. First, we conclude that Dr. Holstein's testimony, when considered in context, can and should be interpreted to refer to exposures for which Crane alone is liable. Second, we conclude that Dr. Holstein's other testimony, when combined with other evidence, was sufficient to give rise to the inference that decedent's exposures to Crane asbestos constituted a substantial factor in increasing his risk of mesothelioma.

First, we consider Dr. Holstein's intended meaning. Dr. Holstein was the first witness to testify. His opinions were based on his review of deposition testimony of fact witnesses who would later testify at trial. Dr. Holstein's opinion specifically referred to Cranite sheet gasket material, not Garlock. In other words, it is clear that Dr. Holstein was not charging Crane with exposures to Garlock gasket material, even when used with Crane valves. Moreover, when considering decedent's work removing used gaskets from Crane valves, Dr. Holstein's testimony clearly indicated that he was concerned with original gaskets supplied from Crane. Before he stated the opinion challenged on appeal, Dr. Holstein testified that decedent frequently worked with Crane

10

valves "and the Crane Co. valves, when they were new, came supplied with gaskets." Later, Dr. Holstein emphasized that the plumbers knew whether the gaskets they were removing from Crane valves were original or replacement gaskets. In short, it is apparent from Dr. Holstein's testimony that when he referred to "Crane valves," he was referring to *original* Crane valves which came shipped with Crane asbestos gaskets preinstalled.[9] To the extent there is any possible ambiguity in Dr. Holstein's reference to Crane valves, we draw all reasonable inferences in favor of the verdict. Dr. Holstein was properly referring only to Crane asbestos products.[10]

Second, we consider whether, apart from the challenged statement, there was sufficient evidence for the jury itself to infer that decedent's exposure to Crane asbestos products alone constituted a substantial factor in contributing to decedent's risk of developing mesothelioma. Dr. Holstein testified that *any* exposure increases risk, but only larger exposures constitute a substantial factor. He then discussed the amount of

[9]    That Dr. Holstein's testimony should not be interpreted as Crane argues is clear when one considers Crane's argument that Dr. Holstein's reference to Crane "valve work" encompassed non-Crane insulation. Dr. Holstein did not testify to the removal of insulation as part of the work decedent did with Crane valves. There is no reason to believe, therefore, that it was encompassed in his reference to Crane "valve work."

[10]    It is also clear that plaintiffs had no intention of holding Crane liable for asbestos which was not Crane asbestos. In the course of a discussion regarding jury instructions, plaintiffs' counsel stated, "I'm not going to say that if another brand's gaskets were used in a Crane valve and they didn't sell it that they were responsible. I've never claimed that. It's not going to come up in this trial." Crane's counsel argued that if the jury was instructed that Crane could be liable for its *valves*, it could be "misunderstood by the jury that putting a Garlock gasket . . . into a Crane . . . valve is an asbestos product of Crane." Plaintiff's counsel responded, "That's not even an issue. I've never said it, no one has ever implied it." The jury was properly instructed that Crane was not responsible for asbestos products it did not manufacture, sell or distribute, even if those products were installed on or in Crane valves.

fibers to which decedent was exposed when doing various tasks. He explained, for comparison, that OSHA has a standard that workplace asbestos exposure must be below 0.1 fibers per cubic centimeter of air, on average, over an 8-hour day, with a maximum of 1 fiber per cubic centimeter short-term exposure.[11] Cutting a gasket out of Cranite releases, on average, between 0.1 and 2 fibers per cubic centimeter of air. Scraping a used gasket off a valve releases, on average, between 0.1 and 15 fibers per cubic centimeter of air. Dr. Holstein testified that if someone performed these tasks for ten seconds and never did them again, "it's not going to be dangerous; so there is a time element, in addition to the air concentration; but if you asked me to assume that a person does this kind of work for a living and, therefore, he does it for days, weeks, months, and years, then there's a real hazard of mesothelioma."

As to the frequency of decedent's exposure to Cranite asbestos fibers, decedent's co-worker testified that, in the 1960's and 1970's, decedent used Garlock and Cranite for gasket materials. Decedent made gaskets out of those products on nearly every job. While it was only necessary to make flange gaskets for valves in boiler and pump rooms, there were many valves involved in those jobs. A pump room alone would have 30 or 40 valves in it. Cranite and Garlock were different colors; decedent's co-worker testified that he probably used more Cranite than Garlock. In short, decedent worked with Cranite for "many, many years" and punched hundreds, if not thousands, of

---

[11] Even with this standard, it was estimate that there would still be 400 cases of mesothelioma per year in the United States. In other words, the OSHA standards do not establish a safe level of exposure.

12

gaskets from it. This is not a brief, fleeting exposure, but a repeated exposure to hazardous concentrations of asbestos over many years.

As to the frequency of decedent's exposure to Crane bonnet gaskets when removing the worn gaskets, there was substantial evidence from which it could be inferred that most bonnet gaskets – even replacement gaskets – removed from Crane valves were Crane gaskets. This is because bonnet gaskets were unique to the valve. Decedent's son, who worked with him, explained that they would use Crane gaskets in Crane valves. He added that it was "the standard of our industry" to replace the gaskets in Crane valves with Crane gaskets. Decedent removed and replaced gaskets "all the time." Crane valves themselves were common in decedent's work. Crane was one of the leading valves and the most popular for lines of a certain size. This is evidence that decedent's asbestos exposures from the removal of Crane bonnet gaskets from Crane valves were frequent and numerous.

Considering the amount of fibers released per cubic centimeter of air and the frequency with which decedent cut gaskets from Cranite and removed worn Crane bonnet gaskets over many years, the jury had a sufficient basis on which to conclude that decedent's exposure to Crane's asbestos products constituted a substantial factor in increasing his risk of mesothelioma. The trial court therefore did not err in denying Crane's motion for judgment notwithstanding the verdict.

4. *Crane was Not Entitled to a Setoff*

After the jury verdict, plaintiffs disclosed the amounts of its settlements with other defendants, and the trial court properly calculated a setoff for those settlements.

13

Crane argued that it was entitled to a further setoff for settlements plaintiffs would be entitled to recover, but had not yet sought, from various asbestos bankruptcy trusts. The trial court disagreed.

On appeal, Crane argues that authority exists for such a setoff based on Code of Civil Procedure section 877 and a court's broad equitable powers. We disagree. Code of Civil Procedure section 877 provides for a setoff when a settlement is given "before verdict or judgment." It has no application to a post-judgment settlement. Similarly, a court has no equitable power to modify a judgment for a settlement which may or may not be sought, may or may not occur, and would be in an unknown amount. Crane's argument is based on nothing more than speculation about future events.

Crane argues that refusing a setoff in this case will allow plaintiffs an improper double recovery. On the contrary, the judgment against Crane does not constitute a double recovery in any way; all other settlements in existence have been properly taken into account. If a *later* settlement *subsequently* allows plaintiffs a double recovery, that does not retroactively make the instant judgment improper.[12]

---

[12] Crane also suggests that a setoff is mandatory because plaintiffs' failure to obtain available settlements from asbestos bankruptcy trusts constitutes a failure to mitigate their damages. Assuming without deciding that obtaining recovery from bankruptcy trusts related to other responsible entities is a part of a plaintiffs' duty to mitigate damages in an asbestos action, the duty to mitigate is an issue to be resolved by the trier of fact at trial (see CACI No. 3930) not something to be raised on new evidence after judgment.

## *DISPOSITION*

The judgment is affirmed.  Plaintiffs are to recover their costs on appeal.

CROSKEY, J.

WE CONCUR:

KLEIN, P. J.

ALDRICH, J.

Filed 3/24/14

*CERTIFIED FOR PUBLICATION*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| ELAINE M. PAULUS et al., | B246505 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC437739) |
| v. | |
| CRANE CO., | ORDER |
| Defendant and Appellant. | (1) MODIFYING OPINION (2) CERTIFYING OPINION FOR PUBLICATION |
| | [NO CHANGE IN JUDGMENT] |


THE COURT:

The opinion filed in this matter on February 21, 2014 is hereby modified as follows:

On page 9, No. 3 Plaintiffs' Evidence . . . , line 5, please change (Emphasis added.) to (Italics added.).

Page 10, line 3, the sentence that begins:  Dr. Holstein's testimony referred the exposures . . . should now read as follows:  Dr. Holstein's testimony referred to the exposures . . . .

When the opinion in this matter was originally filed, it was not certified for publication.  For good cause now appearing, it is hereby ordered that the opinion in this matter, filed on February 21, 2014 is certified for publication.

[NO CHANGE IN JUDGMENT]