Filed 8/20/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JONATHAN HELLAM, as Successor in Interest, etc.,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CRANE CO.,<br><br>     Defendant and Appellant. | A140326<br><br>(Alameda County<br>Super. Ct. No. RG11609947) |

Defendant Crane Co. appeals from an amended judgment entered after a jury found it liable for personal injuries to James Hellam resulting from his exposure to asbestos products.[1] In a prior unpublished opinion (*Hellam v. Crane Co.* (Apr. 16, 2014, A138013, A139141)), we affirmed the original judgment, and the only claims Crane raises in this appeal relate to the application of credits, or setoffs, to reduce its liability for damages based on Hellam's settlements with several other defendants.[2] In particular, Crane argues the trial court improperly (1) accepted the settling parties' 50/50 allocation of the settlement proceeds between the personal-injury claims in this suit and future wrongful-death claims; (2) calculated the setoff for preverdict settlements; (3) denied

---

[1] James Hellam died while this appeal was pending. We granted the motion of Jonathan Hellam, one of his sons, to substitute himself as successor in interest as the plaintiff in this matter. Throughout this opinion, we refer to James Hellam and Jonathan Hellam in his representative capacity as "Hellam" and to Jonathan Hellam in his individual capacity as "Jonathan."

[2] Crane raised similar claims in the prior appeal but represented that an amended judgment had been entered and those claims did not need to be decided yet. In response, we stated that we would "consider any settlement-credit issues Crane wishe[d] to raise if and when it perfect[ed] an appeal from the amended judgment," which is now before us.

1

Crane's request to review unredacted versions of the settlement agreements; (4) treated a settlement with Rheem Manufacturing Company (Rheem) as a preverdict instead of postverdict settlement; and (5) refused to apply a setoff for possible recoveries from asbestos bankruptcy trusts.[3] We agree that the settlement with Rheem was a postverdict settlement and remand for recalculation of its setoff, but we otherwise affirm.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Hellam sued Crane and several other defendants after he developed mesothelioma, a fatal cancer caused by exposure to asbestos. The facts underlying his claims are not at issue and may be briefly summarized from our prior opinion. As a young man in the 1960's, Hellam worked for several summers at his grandfather's boiler business in Monterey, Monterey Boiler Service (MBS). He was exposed to asbestos-containing products, including Crane's, while helping his grandfather refurbish boilers.

By the time of trial, Hellam had reached settlements with several defendants and Crane was the only defendant still actively litigating the case. In November 2012, the jury returned a special verdict in favor of Hellam on his design-defect claim and awarded him $937,882.56 in economic damages and $4.5 million in noneconomic damages. It allocated 75 percent of the fault to MBS, 13 percent to Western Plumbing Supply, 7 percent to Crane, 2 percent to Central Supply, .5 percent to Bendix, 0 percent to Hellam and General Motors, and 2.5 percent to "All Others."

The trial court entered the original judgment against Crane in December 2012. That judgment required Crane to pay the full $937,882.56 in economic damages, although the court noted that the figure "may be adjusted following the Court's determination of a motion for allocation of settlement credits." The court also reduced the judgment against Crane for noneconomic damages to $315,000 (7 percent of $4.5

---

[3] Crane filed a request for judicial notice of the parties' briefing in the prior appeal in the event we vacated the original judgment and ordered it to raise those issues again in this appeal. As we did not do so, we deny the request as moot.

million) to reflect Crane's proportionate liability. We affirmed this judgment in our prior opinion.

A few days before the original judgment was entered, Crane had filed a motion to compel Hellam to disclose all settlement agreements and related documents. Hellam then filed a motion to apply settlement credits against the award for economic damages. He stated that he had reached preverdict settlements with seven defendants and "[t]he total combined settlement amount was $2,152,500." In addition, he represented that he "ha[d] agreed in principle to a settlement with Rheem . . . [but that] that settlement ha[d] not been consummated and no money ha[d] been paid on that settlement." He attached copies of the seven settlement agreements already reached with the amount of each settlement redacted and "request[ed] that all settlement amounts remain confidential" and that any review by the trial court of the unredacted versions be done in camera. These seven agreements and the other two eventually reached, discussed below, all allocated 50 percent of the settlement proceeds to the personal-injury claims in this action and 50 percent to any future wrongful-death claims by Hellam's two adult sons, Jonathan and Aaron Hellam.

The Rheem settlement agreement was eventually executed by Hellam in late December and by his sons the next month, and Hellam later provided a redacted version to Crane and an unredacted version to the trial court. In January filings, Hellam stated that the total amount of settlements as of then was $2,172,500, indicating the settlement with Rheem was for $20,000 because no other settlements had been reached since he had represented that the total was $2,152,500.

In a February 2013 order, the trial court ruled on a number of issues related to settlement credits. It approved the settlement agreements' 50/50 allocation of the proceeds between personal-injury claims and wrongful-death claims, ruled that it would apply 17.2 percent of the preverdict settlement proceeds as a setoff against Crane's liability for economic damages under *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831 (*Greathouse*), and ordered Hellam to provide it with unredacted versions of the settlement agreements for in camera review.

In April 2013, Hellam revealed that in February he had reached a surprise $20,000 settlement, resulting in total settlement proceeds of $2,192,500 from agreements with nine defendants. A redacted version of this last settlement agreement and the name of the settling defendant were also disclosed to Crane. In October, the trial court ruled that $20,000 of the settlement proceeds—presumably those from the surprise settlement— "appear[ed] subject to crediting" under *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1 (*Torres*), which applies to postverdict settlements, "rather than the preverdict settlement crediting process described in *Greathouse*," *supra*, 35 Cal.App.4th 831. The court ordered Hellam to submit an amended judgment reflecting its rulings on settlement-related issues.

Later in October 2013, the trial court entered Hellam's proposed amended judgment. First, the economic-damages award against Crane was reduced from $937,882.56 to $751,047.56 as a result of the "$2,172,500 in pre[]verdict settlements." Second, the noneconomic-damages award against Crane was reduced from $315,000 to $295,000 based on the remaining "$20,000 [from the settlement] entered post[]verdict." Crane timely appealed.

II.

DISCUSSION

A.     *The Trial Court Properly Determined There Was a Reasonable Basis for the 50/50 Allocation of the Settlement Proceeds Between Personal-Injury and Wrongful-Death Claims.*

Crane argues the trial court erred by approving the settlement agreements' allocation of 50 percent of the settlement proceeds to the personal-injury claims in this action and 50 percent to any future wrongful-death claims brought by Hellam's sons.[4] It claims there is "no legal or factual support" for assigning such a large portion of the proceeds to the wrongful-death claims because Jonathan and Aaron are "fully[]independent adults who derive[d] no financial support from their father." We

---

[4] Crane's unopposed motion to augment the record with transcripts of certain trial testimony, evidence that is relevant to this issue, is granted.

4

conclude the court properly determined there was a reasonable basis for the 50/50 allocation.

At trial, Jonathan testified about his and Aaron's relationship with their father, who divorced their mother when they were children. Jonathan described Hellam's involvement in his and his brother's childhoods, which included coaching their sports teams and teaching them about personal values, but focused on the "close relationship" they maintained after the brothers became adults. Jonathan described going to dinners, movies, and sporting events with his father, traveling together, and "one of the main staples of [the] relationship," taking an annual family trip to Clear Lake. He testified that after Hellam was diagnosed with mesothelioma, it became much harder to continue these activities but that the brothers tried to keep their father as involved as possible.

After trial, Hellam submitted a detailed declaration by his counsel with attached exhibits as additional evidence to support the 50/50 allocation. Specifically, he submitted evidence that in multiple asbestos cases juries had awarded wrongful-death damages exceeding damages typically awarded for associated personal-injury claims, including in a 2008 case in which both types of claims were decided at the same time and the jury awarded $3 million to the plaintiff with mesothelioma and $5 million in wrongful-death damages to his 67-year-old spouse and 47-year-old daughter. Hellam also submitted evidence that Crane had agreed to a 50/50 allocation of settlement proceeds in another asbestos case involving a 75-year-old, unmarried plaintiff with two children.

Crane challenged the 50/50 allocation, arguing Hellam had not sustained his burden to show the allocation had a reasonable basis or had been reached in a sufficiently adversarial manner. At a hearing on the issue, the trial court observed:

> "I've had a number of cases, and I think each case stands on its own in terms of human relationships. The fact that a wife wasn't involved . . . instinctively might have some play. But then again, as a matter of human nature, when kids are a product of divorce they often have a much stronger relationship with one or both parents because of the nature of that circumstance. . . .

5

[U]nlike *Jones* [*v. John Crane, Inc.* (2005) 132 Cal.App.4th 990 (*Jones*)], this is not a case where I have no record.  I saw these sons.  I listened to testimony.  They described the nature of the relationship they had with their father, so it's not a blank slate. . . .  Each case presents . . . on its own merits.  And having been a trial lawyer and on the bench, and in the last two years I've had an unusual number of cases that, one way or the other, defense or plaintiff, I think the lawyers would say is one of a kind.  But I'm not sure this is a one-of-a-kind case, but I do think that there was . . ., in terms of what I had observed and the jury heard[,] . . . a very good, strong relationship between Mr. Hellam and his sons."

In its February 2013 order, the court "f[ound] reasonable the allocation between [Hellam] and settling defendants between [his] personal injury claims and his heirs['] wrongful death claims[,] i.e.'50-50,' " reiterating that "[t]he trial record here supports this allocation as does the jury and court's observations of the closeness of this family."

A nonsettling defendant is entitled to a setoff for all preverdict settlements "in the amount stipulated by the [settlement agreements], or in the amount of the consideration paid for [them], whichever is the greater."  (Code Civ. Proc., § 877, subd. (a).[5])  A plaintiff has "the burden . . . to show that [the defendant is] not entitled to a credit in the full amount of the settlements because some portion of the recovery should be allocated to other claims."  (*Jones*, *supra*, 132 Cal.App.4th at p. 1009.)  Where, as here, the trial court has not been asked to find that the settlement agreements were reached in good faith, it is "not bound by the allocations made in the agreements" because they are not necessarily " 'the product of adverse negotiation.' " (*Ibid.*; *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 866.)  Rather, the court must "determine whether there was a reasonable basis on which to justify those allocations" based on the evidence the plaintiff submits.  (*Jones*, *supra,*132 Cal.App.4th at p. 1009.)

"Trial courts generally have wide discretion in allocating prior settlement recoveries to claims not adjudicated at trial."  (*Jones*, *supra*, 132 Cal.App.4th at p. 1008.)  Applying this standard requires us to "examine the court's findings, whether express or

---

[5] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

implied, for the existence of substantial evidence." (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1321.)

Crane argues that Hellam failed to show the 50/50 allocation had a reasonable basis because at best, his sons' damages in a future wrongful-death action "would be limited to the amorphous loss of care, comfort[,] and society along with some nominal costs related to funeral expenses," an amount "drastically different" than the $937,882.56 in economic damages awarded here. It claims Hellam "submitted no evidence that the wrongful-death claim[s] will be as valuable as" the economic-damages award, noting that his "evidentiary presentation at trial focused extensively on [ ] his alleged pain and suffering." But Hellam needed to show only that the 50/50 allocation reached in settlement negotiations—most of which occurred before trial—had a reasonable basis (*Jones*, *supra*, 132 Cal.App.4th at p. 1009), not to prove conclusively that any eventual wrongful-death claims by his sons would be at least as valuable as his own personal-injury claims turned out to be. Hellam's evidence at trial naturally focused on his own claims because those claims, not his sons', were at issue. He was not required to conduct a mini-trial on his sons' possible wrongful-death claims before the 50/50 allocation could be sustained.

In addition, Crane argues that the case law does not support a 50/50 allocation. First, it cites *Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233, which affirmed the trial court's allocation of 34 percent of a settlement to future wrongful-death claims where the plaintiff was married, had two children, one of whom was a minor, and had his life expectancy reduced by 26 years because of his exposure to asbestos. (*Id.* at pp. 1236-1237, 1241-1242.) Crane suggests that because, in contrast, at the time of trial, Hellam was unmarried, both his sons were adults and independent, and he was still alive at age 66, the allocation in this case should not have exceeded 34 percent. But in affirming the 34-percent allocation, the *Hackett* court did not indicate that a higher allocation would have been improper or that the allocation could not have been sustained on different facts. Indeed, part of the "ample evidence" supporting the allocation in *Hackett* was that, "[a]s plaintiffs pointed out to the trial court, allocations of 50 to 70 percent of prior

7

settlements to wrongful death claims were not uncommon in cases brought by much older plaintiffs and by plaintiffs with no minor children. (See, e.g., *Overly v. Ingalls Shipbuilding, Inc.* (1999) 74 Cal.App.4th 164 [upholding 50 percent allocation for worker diagnosed at age 73 with no minor children].)" (*Hackett*, at pp. 1241-1242.) *Hackett* does not establish any ceiling on the percentage of settlement proceeds that may reasonably be allocated to future wrongful-death claims.

Crane also cites *Pfiefer v. John Crane, Inc.*, *supra*, 220 Cal.App.4th 1270, in which the Court of Appeal affirmed the trial court's refusal to accept a 50/50 allocation between personal-injury and wrongful-death claims in the settlement agreements at issue and its finding "that all the settlement funds were applicable to the claims resolved at trial." (*Id.* at p. 1320.) There, the plaintiffs had "offered little or no evidence regarding the reasonableness of the allocation in the settlements," such as any "showing regarding [the deceased plaintiff]'s relationships with his offspring," and the Court of Appeal concluded that "the terms of the settlements" alone did not "require the trial court to accept that allocation." (*Id.* at pp. 1284, 1322.) Thus, *Pfeifer* affirmed based on the lack of evidence supporting the 50/50 allocation in that case, not based on a determination that such an allocation would necessarily lack a reasonable basis. Here, in contrast to *Pfeifer*, Hellam presented a significant amount of evidence supporting the basis of the 50/50 allocation, not only about his relationships with his sons but also about allocations in other cases. Yet Crane never even addresses the latter type of evidence, evidence that also supports the conclusion the allocation had a reasonable basis. (See *Jones*, *supra*, 132 Cal.App.4th at p. 1010; *Hackett v. John Crane, Inc.*, *supra*, 98 Cal.App.4th at pp. 1241-1242.)

Finally, Crane argues that substantial evidence does not support the trial court's ruling because it was "based upon [the court's] hunches [and] intuition," as demonstrated by the court's references at the hearing to " 'human nature' " and its own instincts. But the court made clear it found Hellam's relationships with his sons to be particularly strong and was assessing that fact against circumstances in other cases. We do not think that, in exercising its discretion to determine whether the 50/50 allocation had a

reasonable basis, the court was precluded from drawing inferences based on its own experience. We conclude Jonathan's testimony at trial and the declaration and exhibits submitted by Hellam were substantial evidence supporting the court's determination that the 50/50 allocation had a reasonable basis.

> B.      *The Trial Court Used the Correct Method of Calculating the Setoff for Preverdict Settlements.*

Crane claims the trial court used the wrong method to calculate how much Crane's liability for economic damages should be reduced as the result of preverdict settlements. We disagree.

Two statutes govern the application of settlement credits here. As mentioned above, under section 877, settlements "given in good faith before verdict or judgment" reduce a plaintiff's claims against remaining defendants "in the amount stipulated by the [settlement agreement], or in the amount of the consideration paid for it, whichever is the greater." (§ 877, subd. (a).) And under Civil Code section 1431.2, enacted by Proposition 51, "the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ." (Civ. Code, § 1431.2, subd. (a).) Consistent with these provisions, when, as here, "a pretrial settlement does not differentiate between economic and noneconomic losses," the amount of the settlement attributable to each type of loss must be determined "because 'only the amount attributable to the joint responsibility for economic damages may be used as an offset' " against the damages for which a nonsettling defendant is responsible. (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 722.)

In general, "a ruling granting or denying a section 877 settlement credit" is reviewed for an abuse of discretion. (*Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1044.) "To the extent that we must decide whether the trial court's ruling was consistent with statutory requirements, we apply the independent standard of review." (*Ibid.*)

9

*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268 (*Espinoza*) established the standard method for allocating proceeds from preverdict settlements between economic and noneconomic damages so as to comply with both section 877.6 and Civil Code section 1431.2. (*Rashidi v. Moser*, *supra*, 60 Cal.4th at p. 722.) Under *Espinoza*, a court calculates the percentage of the overall damages award that consists of economic damages, multiplies the settlement proceeds by that percentage, and reduces the economic-damages award by the resulting amount. (*Rashidi v. Moser*, *supra*, 60 Cal.4th at p. 722; *Espinoza*, at p. 277.)

For example, if a jury awards $500,000 in economic damages and $1.5 million in noneconomic damages and there is a preverdict settlement for $100,000, $25,000 of the settlement will be allocated to economic damages and subtracted from the $500,000 award. The remaining $75,000 attributable to noneconomic damages is not applied as a setoff, however, since a settling defendant has no liability for an award of noneconomic damages against a nonsettling defendant. This method harmonizes section 877 and Civil Code section 1431.2 because it "preserves allocation in accord with proportionate fault and does not create a setoff to the nonsettling tortfeasor of noneconomic damages." (*Espinoza*, at p. 277.) The *Espinoza* approach has been applied in a variety of contexts, including asbestos cases. (E.g., *Greathouse*, *supra*, 35 Cal.App.4th at pp. 834, 838-842.)

The appropriate use of the *Espinoza* method has been refined throughout the years, including in two cases that are especially relevant here. In the first, *Poire v. C.L. Peck/Jones Brothers Construction Corp.* (1995) 39 Cal.App.4th 1832 (*Poire*), the jury determined that two defendants who settled before the verdict were not at fault, and the trial court declined to apply any setoff for those settlements. (*Id.* at p. 1836.) The Court of Appeal reversed, reasoning that section 877 requires a setoff for preverdict settlement amounts paid by any " 'tortfeasors *claimed* to be liable for the same tort' " without regard to their actual liability. (*Poire*, *supra*, 39 Cal.App.4th at pp. 1837-1841, italics added.) As a result, the *Espinoza* method was still applicable to preverdict settlements reached with defendants who were eventually found not liable. (*Poire*, *supra*, 39 Cal.App.4th at pp. 1839-1841.)

In *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1 (*Torres*), this division held that when a settlement is reached *after* the verdict, the *Espinoza* method should not be used to allocate the funds between economic and noneconomic damages. (*Torres, supra,* 49 Cal.App.4th at p. 40.) Because "the settling defendant's actual liability for economic and noneconomic damages has been determined at that point," using the *Espinoza* method would sometimes, as in *Torres*, result in allocation of more of the settlement proceeds to noneconomic damages than the amount of noneconomic damages for which the settling defendant was liable under the verdict. (*Torres, supra,* 49 Cal.App.4th at pp. 38-39.) For example, suppose a jury awarded $500,000 in economic damages and $1.5 million in noneconomic damages, and a defendant found to be 2 percent at fault settled after the verdict for $100,000. Under the *Espinoza* method, the setoff for economic damages would be $25,000 (25 percent of $100,000), leaving the remaining $75,000 of the settlement funds allocated to noneconomic damages. But based on the verdict, that defendant was only liable for $30,000 in noneconomic damages (2 percent of $1.5 million). *Torres* recognized that using the *Espinoza* method will result in a "windfall" to the plaintiff —in the example, the extra $45,000 allocated to noneconomic damages beyond the settling defendant's liability for them—whenever the total amount the plaintiff recovers from nonsettling defendants under the judgment and from settling defendants under settlement agreements exceeds the amount recoverable under the judgment if no settlements were ever reached. (*Torres*, at pp. 39-40.)

Instead, *Torres*, *supra*, 49 Cal.App.4th 1 adopted a " 'ceiling' " approach to allocating postverdict settlement proceeds, under which the proceeds are "allocated first to noneconomic damages, but only up to the amount of the settling defendant's liability for such damages, with the balance then allocated to economic damages." (*Id.* at p. 40.) Applying this approach to the previous example, $30,000 of the settlement would be allocated to noneconomic damages (the defendant's actual liability for those damages under the verdict) and the remaining $70,000 would be applied as a setoff against the award of economic damages. *Torres* determined this approach would still encourage postverdict settlements, as "the plaintiff will retain some hope of full recovery in every

11

case where the settlement equals or exceeds the settling defendant's liability for noneconomic damages." (*Id.* at p. 41.)

In this case, the trial court applied the *Espinoza* method to calculate the setoff from preverdict settlements. The jury awarded $937,882.56 in economic damages and $4.5 million in noneconomic damages, a total award of $5,437,882.56. Thus, the percentage of the overall award that was economic damages was 17.2 percent ($937,882.56 divided by $5,437,882.56).[6] The court determined that $2,172,500 of the settlement proceeds were from preverdict settlements (all the settlements except the surprise settlement) and reduced that number by half, to $1,086,250, to account for the 50/50 allocation between personal-injury and wrongful-death claims that we have determined was proper. Finally, $1,086,250 was multiplied by 17.2 percent yielding $186,835, the amount of the preverdict settlement proceeds allocated to economic damages, and $186,835 was then subtracted from the overall economic damages award of $937,882.56 to reduce Crane's liability for economic damages to $751,047.56.

Crane contends the trial court should not have used the *Espinoza* method because it resulted in an allocation of more settlement proceeds to noneconomic damages than the amount of noneconomic damages for which the jury found those settling defendants liable. Crane reasons that under the *Espinoza* method, the amount of the preverdict settlement proceeds allocated to noneconomic damages was $899,415, that is, the remaining 82.8 percent of $1,086,250. But according to Crane, the comparative fault of this group of settling defendants was, at most, 16 percent: monetary settlements were never reached with either MBS, which was found to be 75 percent at fault, nor with the entity liable for Central Supply, which was found to be 2 percent at fault, and Crane was found to be 7 percent at fault. Thus, the defendants who settled before the verdict were only liable for noneconomic damages of at most $720,000 (16 percent of the total $4.5 million in noneconomic damages awarded by the jury). As a result, Crane claims, Hellam received a "windfall" of at least $179,415, the difference between the $899,415 in

---

[6] The actual percentage is slightly above 17.2, but Crane does not contend that the trial court erred by rounding down to that figure and we will therefore use it as well.

settlement proceeds allocated to noneconomic damages using the *Espinoza* method and the $720,00 (or less) in noneconomic damages for which these settling defendants were actually liable.

Crane argues that as a result, the trial court should not have stopped once it applied 17.2 percent of a given settlement's proceeds as a setoff against the economic damages award. Instead, the court should have also applied as a setoff any portion of the remaining 82.8 percent of the settlement proceeds that exceeded the particular settling defendant's actual liability for noneconomic damages. Essentially, Crane suggests that a modified *Torres* approach should be applied to preverdict settlements. Here, this approach would result in, at minimum, Crane's liability for economic damages being reduced by the $179,415 "windfall"—and even more, depending on the extent to which the portion of fault the jury assigned to an individual settling defendant caused the amount of the settlement proceeds allocated to noneconomic damages under the *Espinoza* method to exceed the amount of noneconomic damages that defendant was liable for under the verdict.[7]

Crane's proposed approach is completely at odds with *Poire*, *supra*, 39 Cal.App.4th 1832 and the cases cited therein, which recognize that "the amount of a setoff [for a preverdict settlement] is not determined by the settling tortfeasor's proportionate share of responsibility for the injury." (*Id.* at pp. 1839-1841.) In *Poire*, the jury awarded $285,000 in damages, $202,000 (70.88 percent) of which was for economic damages and the remaining $83,000 of which was for noneconomic damages. (*Id.* at pp. 1836, 1841.) The Court of Appeal held that the *Espinoza* method should be applied to preverdict settlements with defendants ultimately found not liable at all, so that 70.88 percent of the settlement amount was credited against the economic damages award. (*Poire, supra,* 39 Cal.App.4th at pp. 1836, 1841.) As a consequence, the remaining 29.12 percent of the settlement proceeds were allocated to noneconomic damages, even though

_____

[7] Crane is unable to determine the actual claimed "windfall" because the amounts of the individual settlements were not disclosed to it. As we discuss in part II.C., this circumstance is not a basis for requiring disclosure of the unredacted agreements.

13

the settling defendants were not liable for *any* noneconomic damages. Thus, *Poire* approved an allocation of settlement proceeds to noneconomic damages that exceeded settling defendants' actual liability for those damages, exactly what Crane complains of here.

Crane argues that *Poire*, *supra*, 39 Cal.App.4th 1832 is not controlling because the Court of Appeal "neither considered nor discussed the limitation of . . . Civil Code section 1431.2 to the *Espinoza* approach when application of [that] approach allocates a settlement to noneconomic damages in excess of a settling defendant's several liability for noneconomic damages." But in holding that the jury's finding of no liability did not preclude a setoff, *Poire* affirmed the broader principle that a settling defendant's portion of fault does not affect the availability of a setoff against an award of economic damages. (See *Poire*, *supra*, 39 Cal.App.4th at pp. 1838-1841.) This is true for two reasons. First, as stated above, section 877 applies to settling "tortfeasors claimed to be liable for the same tort" and thus " 'does not require any defendant to prove that settling codefendants were in fact liable.' " (§ 877; *Poire*, at p. 1839.) Second, section 877 requires reduction of economic damages "in the amount stipulated by the release . . . or in the amount of the consideration paid for it, whichever is the greater." (§ 877, subd. (a).) Thus, the jury's determination of a settling defendant's liability for damages is irrelevant because only the amount paid under the settlement agreement to compensate for economic damages may be applied as a setoff and that amount does not turn on the defendant's level of fault.

*Torres*, *supra*, 49 Cal.App.4th 1 does not compel a different result. That decision recognized that when a settlement is reached after the verdict, using the *Espinoza* method to calculate the setoff will result in a "windfall" to the plaintiff whenever the total amount the plaintiff recovers from settlements and from nonsettling defendants under the judgment exceeds the amount it could have recovered if no settlements were ever reached. (*Id.* at pp. 39-40.) In such circumstances, "[t]he prospect of such a windfall could become a factor in settlement negotiations, with the plaintiff agreeing to accept a lesser amount than it otherwise would because the shortfall could be collected from the nonsettling defendant," resulting in the "bargaining at the expense of non[]settling

14

defendants" that the *Espinoza* method is supposed to avoid. (*Torres, supra,* 49 Cal.App.4th at p. 40.) Here, in contrast, no such concern exists because the settlements were reached before the verdict, when the settling defendants' actual liability was still unknown.

Moreover, applying a modified *Torres* approach instead of the *Espinoza* method in these circumstances would *not* be consistent "with several public policies strongly reflected in the law, including section 877's objectives of equitably sharing costs among the parties at fault and encouraging settlement" and "the principle that '[a] court considering the amount of credit or setoff to be accorded a nonsettling defendant . . . must take into account . . . another important public policy: " 'the maximization of recovery to the plaintiff for the amount of . . . injury to the extent that negligence or fault of others has contributed to it.' [ ]" ' " (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 101.) "[W]hile the nonsettling defendant is entitled to a fair setoff, the injured plaintiff also has a right that the setoff not be excessive." (*Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1500.) Under *Espinoza* and *Poire*, the portion of fault ultimately assigned to defendants settling before the verdict never affects the setoff amount, which depends solely on how the overall award is apportioned between economic and noneconomic damages. Using Crane's approach, however, can only harm a plaintiff because it will always result in a setoff equal to or greater than that under the *Espinoza* method, never a smaller one. As a result, a plaintiff will always run the risk that the portion of fault assigned to settling defendants will be low enough that the amount of noneconomic damages they are liable for will be *lower* than the amount of the settlement proceeds allocated to noneconomic damages under the *Espinoza* method, resulting in a higher setoff. But there will be no countervailing benefit if the portion of fault eventually assigned to settling defendants is high enough that the amount of noneconomic damages they are found liable for is *higher* than the amount of the settlement proceeds allocated to noneconomic damages under the *Espinoza* method, because in that situation the setoff will remain the same.

15

In sum, Crane has offered no good reason to depart from the *Espinoza* method here. We conclude the trial court properly chose to use that method to calculate the setoff from preverdict settlements.

C.   *Crane Has Not Demonstrated Any Valid Need to Review the Unredacted Settlement Agreements.*

Crane argues the trial court erred by refusing to require disclosure of the unredacted settlement agreements and reviewing them in camera instead. This claim fails because Crane has not demonstrated any need to know which defendants paid which amounts in settlement, the only significant information missing from the redacted versions disclosed to it.

In December 2012, Crane filed a motion "for full disclosure of all settlement agreements, releases, related correspondence, and any other documents describing settlements between [Hellam] and other defendants in this case, including disclosure of any allocation of settlement funds and any other terms of such settlements." Hellam produced the agreements, redacting only social security numbers and the amount each settling defendant paid, and disclosed the total amount of all settlement proceeds in a declaration. Each agreement included a confidentiality provision preventing disclosure of the settlement's terms, including the amount paid, except as required by law.

In a written ruling, the trial court "acknowledge[d] defense counsel's right to know [the settlement] terms for the crediting process and the effective representation of their client while at the same time acknowledging the interest(s) of the settling parties in keeping the same confidential," and it ordered Hellam to provide the unredacted agreements to it for in camera review. The unredacted agreements were never produced to Crane, and they are not in the record before us.

We review the trial court's ruling involving the settlement agreements' disclosure for an abuse of discretion. (See *People ex rel. Lockyer v. Superior Court* (2004) 122 Cal.App.4th 1060, 1071; *Mediplex of California, Inc. v. Superior Court* (1995) 34 Cal.App.4th 748, 750.)

16

Crane claims that, "[a]t a minimum, [it] is entitled to know 'who has settled with whom, the dollar amount of each settlement, if any settlement is allocated, how it is allocated between issues and/or parties, what nonmonetary consideration has been included, and how the parties to the settlement value the nonmonetary consideration.' " (Quoting *Alcal Roofing & Insulation v. Superior Court* (1992) 8 Cal.App.4th 1121, 1129 (*Alcal*).) In *Alcal*, a construction case, the multiparty settlement agreement at issue included an allocation between types of claims to address uncertainties in the amount of the setoffs. (*Id.* at pp. 1122, 1124-1125.) The plaintiff filed a motion asking the trial court to find the settlements were reached in good faith under section 877.6, and the nonsettling defendant opposed. (*Id.* at pp. 1122-1123.) The plaintiff did not disclose, to either the trial court or the nonsettling defendant, the written settlement agreement or the amount of the allocation except as to one of the settling defendants. (*Id.* at pp. 1126-1127.) Nevertheless, the court granted the section 877.6 motion. (*Id.* at p. 1123.) The Court of Appeal vacated that decision, holding that where a section 877.6 motion is contested, a plaintiff must disclose settlement amounts, allocations, and the other information identified in the passage Crane quotes before the motion can be granted. (*Id.* at pp. 1127, 1129.) Other decisions relied on by Crane have similarly held that disclosure of various settlement information is required in the context of section 877.6 motions. (*Mediplex of California, Inc. v. Superior Court*, *supra*, 34 Cal.App.4th at pp. 750-753 [plaintiff required to produce settlement agreement where disclosure of only certain terms "put [the nonsettling defendant] in the position of having to 'take on faith' that its adversaries properly decided what terms were important and fairly represented them"]; *J. Allen Radford Co. v. Superior Court* (1989) 216 Cal.App.3d 1418, 1423-1424 [no "privilege of nondisclosure" of settlement agreements where parties "move to confirm the good faith of their settlement under section 877.6"]; see also *Regan Roofing Co. v. Superior Court* (1994) 21 Cal.App.4th 1685, 1700 [citing *Alcal*'s "guidelines"].)

We agree with Hellam that *Alcal*, *supra*, 8 Cal.App.4th 1121 and the other cases addressing section 877.6 motions are inapposite because no such motion was filed in this case. In the context of section 877.6 motions, knowing how much each individual

17

defendant paid in settlement *is* necessary. This is because in determining whether a settlement is in good faith, a variety of factors may be relevant, including "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499.) Here, however, we cannot perceive why Crane needs to know which defendants paid which amounts in settlement. Crane claims that without that information, it was "unable to apply the appropriate method of settlement allocation to [the] settlements"—that is, the modified *Torres* approach discussed above. This argument fails in light of our determination that the trial court properly applied the *Espinoza* method to the preverdict settlements, since that method does not turn on a particular defendant's actual liability. Given that Crane offers no other reason it needed to see the redacted information, we conclude the court did not abuse its discretion by refusing to compel Hellam to disclose the individual settlement amounts to Crane.

D.    *The Rheem Settlement Should Have Been Treated as a Postverdict Settlement.*

Crane claims the setoff for the settlement with Rheem was misallocated because the trial court treated that settlement as a preverdict settlement even though it was not finalized until after the verdict was returned. We agree that it was a postverdict settlement and remand for recalculation of the setoff for it under the *Torres* approach instead of the *Espinoza* method.

As discussed above, the Rheem settlement agreement was not included in Hellam's December 2012 submission of redacted versions of the other agreements because it was not yet "consummated." At a January 2013 hearing, Hellam's counsel further explained that there was "a little difficulty working out the release language . . . . Oftentimes, it takes far longer to resolve release language than it does the amount. We settled the amount a long time ago." The Rheem agreement was eventually fully executed at the end of that month. The amended judgment included the Rheem settlement in the group of preverdict settlements for which a setoff was calculated under

18

the *Espinoza* method, but the trial court never explained its basis for determining the Rheem settlement was reached before the verdict.

Again, we review the trial court's ruling for an abuse of discretion while independently determining "whether [it] was consistent with statutory requirements." (*Wade v. Schrader*, *supra*, 168 Cal.App.4th at p. 1044.)

By its terms, section 877 applies only to "a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment . . . given . . . before verdict or judgment." (§ 877.) And, as *Espinoza*, *supra*, 9 Cal.App.4th 268 and *Torres*, *supra*, 49 Cal.App.4th 1 make clear, the rationale for calculating setoffs for preverdict settlements under section 877 differently than setoffs for postverdict settlements is based on the different incentives affecting settlement depending on whether a defendant's actual liability has already been determined. The Rheem settlement was undisputedly executed several weeks after the verdict, at which point the jury had already determined Rheem's actual liability. Thus, it was not a preverdict settlement under section 877's plain terms.

Hellam does not provide any authority to the contrary. Instead, he argues that while the Rheem settlement was "finalized after the verdict," the settlement amount was agreed to well before the verdict and that the trial court was well within its discretion in determining that this circumstance sufficed to transform the settlement into a preverdict settlement. We disagree. Even if the final settlement amount was agreed to before the verdict, that amount was not binding until the agreement was executed. Hellam offers no reason that he would have been unable to renegotiate the amount once the verdict was reached to take advantage of his knowledge of Rheem's actual liability, and the fact he did not take advantage of this opportunity is immaterial. Moreover, the trial court did not make any factual findings to support the conclusion that the settlement with Rheem was "given before verdict or judgment" under section 877. We conclude that, at least under the circumstances present here, the timing of the settlement agreement's execution is determinative.

19

Our determination that the Rheem settlement was reached after the verdict does not, however, automatically benefit Crane. As discussed above, the amount of a preverdict settlement to be applied as a setoff against an award of economic damages is calculated under the *Espinoza* method by multiplying the settlement amount by the percentage of the total damages award that represents economic damages (here, 17.2 percent). And the amount of a postverdict settlement to be applied as a setoff against an award of economic damages is calculated under *Torres*, *supra*, 49 Cal.App.4th 1 by determining the settling defendant's liability for noneconomic damages and subtracting that amount from the settlement amount. Thus, only if the difference between the settlement amount and Rheem's liability for noneconomic damages exceeds 17.2 percent of the settlement amount will the *Torres* approach result in a greater setoff and thus benefit Crane.

Crane apparently assumes otherwise, perhaps based on the misapplication of *Torres*, *supra*, 49 Cal.App.4th 1 in the amended judgment. The amended judgment, which as we have mentioned was drafted by Hellam, subtracted the full $20,000 of the surprise, postverdict settlement from the $315,000 judgment against Crane for noneconomic damages. If this approach was correct, then the error in counting the Rheem settlement in the preverdict group was prejudicial because the overall award should have been reduced by the full amount of that settlement instead of 17.2 percent of that amount.

But neither *Torres*, *supra*, 49 Cal.App.4th 1 nor any other authority of which we are aware supports applying a setoff for a postverdict settlement against an award of *noneconomic* damages. There is no joint and several liability for noneconomic damages, and Crane alone is liable for the $315,000. Although the *Torres* approach involves calculating the settling defendant's liability for noneconomic damages, the resulting setoff, just like a setoff calculated under the *Espinoza* method, is applied against the award of economic damages, preserving the plaintiff's "hope of full recovery in every case where the settlement equals or exceeds the settling defendant's liability for noneconomic damages." (*Torres*, at p. 41.) Moreover, the full amount of a postverdict

settlement will be applied as a setoff only if the settling defendant is not liable for noneconomic damages at all, either because none were awarded or that defendant was found to have no fault. But neither of those circumstances is present here, as the jury awarded noneconomic damages to Hellam and Rheem is included in the "All Others" group collectively assigned 2.5 percent liability.[8]

We conclude that a remand is necessary for the trial court to recalculate under a correct application of the *Torres* approach the amount of the setoff attributable to the Rheem settlement.[9] In doing so, we note that not all the variables affecting the calculation have been determined. Although it appears from Hellam's filings below that the Rheem settlement amount was $20,000, Rheem's liability for noneconomic damages is unclear. In particular, the parties have not litigated how the individual liability of the defendants in the "All Others" group should be determined, and the trial court should consider this issue in the first instance.

E.       *The Trial Court Properly Declined to Reduce the Damages Award to Account for Possible Future Recoveries from Asbestos Bankruptcy Trusts.*

Finally, Crane argues the trial court erred by not reducing the judgment to account for Hellam's "anticipated asbestos bankruptcy trust recoveries." This claim is meritless.

In response to Hellam's motion to apply settlement credits, Crane submitted an expert report estimating that Hellam stood to recover between $525,000 and $750,000 from various asbestos bankruptcy trusts, which were established "to assume the legal responsibility of . . . asbestos-related liability" of "companies that have filed for bankruptcy reorganization due to asbestos litigation." Crane argued that it was entitled to a setoff based on such expected recoveries. Hellam then disclosed that he had submitted

---

[8] Crane states in passing that Rheem "was assigned no fault by the finder of fact" but does not provide any support for this assertion. In fact, Crane took the position below that Rheem *was* in the "All Others" group and that its portion of fault was .1 percent.

[9] Neither party challenges the erroneous application of the *Torres* approach to the surprise settlement to reduce Crane's liability for noneconomic damages by $20,000, and we therefore accept this aspect of the amended judgment. We see no reason, however, that the trial court cannot correct the mistake on remand.

a claim to the Johns Manville (JM) bankruptcy trust in December 2012 and that, "[b]ased on the 'matrix' of prior JM bankruptcy claims, the potential recovery within approximately three months is $26,250" (the same average recovery from that trust calculated by Crane's expert). But Hellam challenged Crane's claim that recovery from other entities' trusts was likely, given that no evidence of his exposure to asbestos from those entities' products had ever been presented. The record does not indicate whether he ever recovered money from the JM trust, and the trial court did not apply a setoff for any potential recoveries from it or other asbestos bankruptcy trusts.

As with Crane's other claims involving the application of settlement credits, we review the trial court's ruling on this issue for an abuse of discretion while independently determining "whether [it] was consistent with statutory requirements." (*Wade v. Schrader*, *supra*, 168 Cal.App.4th at p. 1044.)

Crane argues the trial court was required to exercise its "broad equitable powers" to reduce the damages award to account for potential recoveries from asbestos bankruptcy trusts, based on section 877 and the principle precluding plaintiffs from recovering more than once for one injury. In *Paulus v. Crane Co.* (2014) 224 Cal.App.4th 1357, Crane made the same argument and the Second District Court of Appeal rejected it, holding that section 877 "has no application to a postjudgment settlement," that "a court has no equitable power to modify a judgment for a settlement which may or may not be sought, may or may not occur, and would be in an unknown amount," and that the fact "a later settlement [might] subsequently allow[] [a] plaintiff[] a double recovery . . . does not retroactively make the instant judgment improper." (*Paulus v. Crane Co., supra,* 224 Cal.App.4th at p. 1367, fn. omitted, italics omitted.)

Crane attempts to distinguish *Paulus v. Crane Co.*, *supra*, 224 Cal.App.4th 1357 on the ground that in that case, "the plaintiff had failed to take any action to pursue bankruptcy recoveries," whereas here, Hellam "already sought a bankruptcy recovery and [his] admitted expected recovery was identical to Crane['s] evidence." It is true that his future recovery from one of the trusts was more *likely* than the *Paulus* plaintiff's was to the extent he had already made a claim and the parties agreed on the likely amount of

recovery. But *Paulus*'s basic point is that until such a recovery is *actually received*, it cannot be applied against a judgment. (See *Garcia v. Duro Dyne Corp.*, *supra*, 156 Cal.App.4th at pp. 99-100 ["a nonsettling defendant is not entitled to [a setoff] for . . . a settlement until the settlement monies have been paid"]; *Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 264 [no abuse of discretion where trial court denied setoff for unpaid settlement but preserved ability to grant such a setoff should settlement later be paid].) We agree with Hellam that *Paulus* is dispositive here. The trial court did not err by refusing to apply a setoff for uncertain future recoveries from asbestos bankruptcy trusts.

## III.
### DISPOSITION

The judgment is vacated and the cause is remanded to the trial court with directions to reconsider its application of settlement credits in light of our determination that the Rheem settlement was reached after the verdict. Hellam is awarded his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3), (5).)


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
STREETER, J.


23

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Robert McGuiness

Counsel for Plaintiff and
Respondent:

Kazan, McClain, Satterley & Greenwood
Francis E. Fernandez
Ted W. Pelletier
Ian A. Rivamonte

Counsel for Defendant and :
Appellant:

K&L Gates LLP
Michele C. Barnes
Daniel W. Fox
Nicholas P. Vari
Michael J. Ross
Michael J. Sechler

*Hellam v. Crane Co.* A140326