Filed 10/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| WILLIAM GARCIA et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> REIJO K. MYLLYLA et al., <br><br> Defendants and Appellants. | B292322 <br><br> (Los Angeles County <br> Super. Ct. No. BC633915) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Monica Bachner, Judge. Affirmed.

James G. Lewis for Defendants and Appellants.

Musick, Peeler & Garrett, Dan Woods; Inner City Law Center, Kimberly A. Miller, Hannah Courtney; Alder Law, Michael Alder and Alexis Gamliel for Plaintiffs and Respondents.

_____

Nine individual tenants (collectively, Plaintiffs) prevailed in a jury trial on claims against the former owners of an illegally operated building stemming from uninhabitable conditions in the building. The former owners, Reijo Myllyla and the Estate of Hellen Terttu Hill (collectively, Myllyla), appeal from the judgment, arguing that: (1) the jury's award of punitive damages was not supported by the evidence and was excessive; (2) the jury's award of noneconomic damages was not supported by the evidence; (3) the trial court should have granted a set-off to the damage award based upon amounts paid by prior settling defendants; and (4) repeated references to Myllyla as a liar during trial resulted in unfair prejudice. We reject each of Myllyla's arguments and affirm.

BACKGROUND

1. **The Evidence**

Until February 26, 2015, Myllyla owned a two-family residential building on Hartford Avenue in Los Angeles (the Building). Although it was zoned as a duplex, Myllyla illegally rented it as 12 separate units.

Only two units in the Building had kitchens, and there were only two community rest rooms. There was evidence that human waste had been thrown out of the Building and had collected on the back. There were openings that permitted rodents and vermin to enter. Steps to the Building were infected with dry rot and were close to collapsing. The Building contained illegal electrical work. An inspection by Plaintiffs' expert revealed dead and live cockroaches throughout the Building and dirty bathrooms.

As discussed further below, each of the Plaintiffs testified about his or her experiences in the building, which included

cockroaches, bed bugs and other vermin; mold; and filthy conditions in common areas. Tenants were forced to wash their dishes outside the Building. There were several months when the Building had no power or water and residents had to purchase buckets of water from Myllyla's daughter. One tenant had a cockroach removed from her ear.[1]

Records from the City of Los Angeles Housing Department (Department) showed that Myllyla repeatedly and falsely told the Department that the Building was occupied only by family members. The Department does not have jurisdiction to inspect or respond to complaints about such a building. Myllyla admitted that he lied to the Department about the Building's occupancy to avoid inspection. He acknowledged that he operated the Building illegally for 13 years because he could not bring it up to code.

2.      **Proceedings Below**

Plaintiffs' first amended complaint (Complaint) named Myllyla along with the current owners who purchased the Building from Myllyla in February 2015. The current owners settled and were dismissed in January 2018.

The claims against Myllyla were tried to a jury in a bifurcated proceeding in April and May 2018. The jury returned a special verdict in favor of each of the Plaintiffs on each plaintiff's claims for negligence; breach of implied warranty of habitability; premises liability; negligent failure to provide

---

[1] Although this incident and the months without water apparently occurred before the period for damages permitted by the statute of limitations, as discussed below the jury could have reasonably found that prior traumatic experiences in the Building made Plaintiffs more sensitive to problems that continued into the statutory period.

3

habitable premises; breach of implied covenant of quiet enjoyment; intentional infliction of emotional distress; and nuisance. The jury awarded economic damages in the form of rent abatement to each plaintiff in amounts ranging from $0 to $7,000, and awarded noneconomic damages for each plaintiff of either $10,000 or $15,000. The jury also found that Myllyla engaged in conduct amounting to malice, oppression or fraud.

Following the second phase of the bifurcated trial, the jury awarded each plaintiff $95,000 in punitive damages.

## DISCUSSION

### 1. The Punitive Damage Awards Were Proper

#### A. *Myllyla forfeited his argument that Plaintiffs failed to introduce evidence of his net worth*

Myllyla argues that the punitive damage awards were improper because Plaintiffs did not prove Myllyla's net worth. The record shows that Plaintiffs were excused from this requirement because Myllyla refused to produce evidence of his financial condition.

A plaintiff who seeks punitive damages ordinarily must introduce evidence of a defendant's net worth. (*Adams v. Murakami* (1991) 54 Cal.3d 105.) This rule is based on the fact that "[a] reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." (*Id.* at p. 110.) That is because whether a punitive damage award " 'exceeds the level necessary to properly punish and deter' " depends upon a particular defendant's financial circumstances. (*Ibid.*, quoting *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.)

4

However, a defendant who thwarts a plaintiff's ability to meet this obligation may forfeit the right to complain about the lack of evidence of his or her financial condition. In *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, the plaintiff prevailed on its claim for fraud following a court trial. The trial court then ordered the defendant to produce documents concerning his net worth for a hearing on punitive damages. The defendant did not comply with the order. (*Id.* at pp. 603–604.) The appellate court held that the defendant was therefore estopped from objecting to the absence of evidence of his financial condition. (*Id.* at p. 600.) The court concluded: "By his disobedience of a proper court order, defendant improperly deprived plaintiff of the opportunity to meet his burden of proof on the issue. Defendant may not now be heard to complain about the absence of such evidence." (*Id.* at p. 609.)

Similarly, in *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*), the court held that a defendant was estopped from arguing that the evidence of his financial condition was insufficient to support a punitive damage award because he failed to comply with a subpoena requiring him to produce records of his financial condition at trial. (*Id.* at pp. 1337–1338.) The court explained that "for purposes of requiring attendance and the production of documents at trial, a subpoena is equivalent to a court order." (*Id.* at p. 1338.) In light of the defendant's failure to comply with the subpoena, the court concluded that "he is estopped from challenging the punitive damage awards based on lack of evidence of his financial condition or insufficiency of the evidence to establish his ability to pay the amount awarded." (*Ibid.*; see *Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942 ["A defendant is in the best position to

know his or her financial condition, and cannot avoid a punitive damage award by failing to cooperate with discovery orders"].)[2]

The same rule applies here. Before trial, Plaintiffs served two notices on Myllyla pursuant to Code of Civil Procedure section 1987, which establishes a procedure to compel a party to attend trial and produce documents at trial in lieu of service of a subpoena.[3] Notice under this section has "the same effect as service of a subpoena on the witness." (§ 1987, subd. (b).) The first notice, served on March 29, 2018, sought Myllyla's presence to testify at trial on April 17, 2018. The second notice, served on April 13, 2018, sought Myllyla's presence at trial along with production of a variety of documents relating to his financial condition.

After the jury returned its verdict on May 1, 2018, the trial court discussed with counsel their plans to proceed with the punitive damages phase of trial. Plaintiffs' counsel advised the court that Plaintiffs had requested documents from Myllyla relating to punitive damages, but "defense counsel has indicated there won't be any provided." Plaintiffs' counsel also told the court that he understood Myllyla himself did not intend to

---

[2] The court in *Corenbaum* noted that the defendant had not challenged the subpoena on appeal. (*Corenbaum, supra,* 215 Cal.App.4th at p. 1338.) In contrast, as discussed below, Myllyla does challenge the validity of Plaintiffs' notice seeking to compel his attendance and the production of documents concerning his financial condition. The distinction is not important, as we reject Myllyla's challenge to the validity of the notice.

[3] Subsequent undesignated statutory references are to the Code of Civil Procedure.

appear, and that the proceeding therefore "will only be argument."

The next day, Plaintiffs' counsel confirmed that Myllyla had not provided any documents, even though Plaintiffs had "served a notice to appear at trial with a request for documents in lieu of a subpoena." Myllyla's counsel responded that "the notice she served did not ask for a single document that established net worth as of the present." At Myllyla's request, the court reviewed the notice and noted that it designated a number of financial documents, including tax returns, financial statements and account statements. The court concluded that it "certainly asks for assets and liabilities."

Plaintiffs' counsel also confirmed that Myllyla would not be appearing, stating that "there is no evidence because the defense has refused to provide it." Myllyla's counsel responded by stating only that "[i]f she had the documents, there is no need to take testimony."

Thus, the record shows that Myllyla failed to comply with the notice to appear and Plaintiffs' demand for documents, which was the equivalent of a court order. Nor did he object to the validity of the notice or the demand at trial. His refusal to produce documents or to appear to testify is the reason that Plaintiffs did not have evidence of his net worth. Myllyla is therefore estopped from challenging the punitive damage award on the ground that Plaintiffs failed to introduce such evidence.

Myllyla argues that Plaintiffs' notice was invalid because it was served on April 13, only four days before trial, and it therefore did not provide the required 20-day notice to produce the requested documents or the required 10-day notice for a

7

personal appearance.  (See § 1987, subds. (b) & (c).)  We reject the argument.

As discussed above, Myllyla did not object to the notice. Section 1987, subdivision (c) provides the party served with a request for documents with the option to file written objections within five days of service, "or any other time period as the court may allow."  Such objections excuse compliance unless the serving party files a noticed motion with a showing of good cause. With respect to a request for personal appearance, the served party may file a motion to quash under section 1987.1.  (See § 1987, subd. (b) [a notice for personal appearance "shall have the same effect as service of a subpoena on the witness, and the parties shall have those rights and the court may make those orders . . . as in the case of a subpoena for attendance before the court"].)

As the trial court observed in denying Myllyla's posttrial motion for judgment notwithstanding the verdict, Myllyla did not object to Plaintiffs' notice at any time prior to or during trial.  We agree with the trial court's conclusion that, "[g]iven Defendants failure to either object (whether orally or in writing) or produce Myllyla or the documents requested, Plaintiffs were entitled to present argument to the jury regarding punitive damages without considering Defendant Myllyla's financial condition."

Myllyla attempts to avoid the consequences of his failure to object by arguing that the shortened time for compliance meant that the notice "on its face . . . is invalid."  Myllyla does not cite any authority for the proposition that a person served with a notice under section 1987 containing a shortened production time

8

may simply ignore the notice on the ground that it is invalid.[4] Enforcement of a notice to produce documents on a shortened time schedule does not exceed the court's authority (in contrast to, for example, a notice that exceeds the court's geographic jurisdiction).  (Cf. *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London* (1995) 34 Cal.App.4th 554, 559 [notice to a nonresident to appear in violation of section 1989 was "void on its face" and no objection was therefore required].)  Indeed, section 1987, subdivision (c) specifically states that a notice to produce documents may be served 20 days before the time required for attendance or "within any shorter period of time as the court may order."

A rule that a served party has no obligation to object to the time for compliance identified in a section 1987 notice would be inconsistent with the specific objection procedure established by section 1987, subdivision (c).  It would also be inconsistent with the rule concerning motions to quash (which applies to the equivalent notice to appear under section 1987, subdivision (b)).  That rule identifies the specific situations in which a motion to

---

[4] In *Morgan v. Davidson* (2018) 29 Cal.App.5th 540, the court held that the defendant's failure to comply with notices to produce financial documents under section 1987 excused the plaintiff from the requirement to introduce evidence of the defendant's financial condition to obtain punitive damages.  The court rejected the argument that the notices in question were untimely, finding that the trial court might have concluded that they had been timely served.  (*Id.* at p. 552.)  The court therefore did not reach the plaintiff's alternative argument, identical to the trial court's finding here, that the defendant never objected to the notices and therefore forfeited "any argument about an untimely notice."  (*Id.* at p. 551.)

quash is not necessary.  (See, e.g., § 1987.1, subd. (c) ["Nothing in this section shall require any person to move to quash, modify, or condition any subpoena duces tecum of personal records of any consumer served under paragraph (1) of subdivision (b) of Section 1985.3 or employment records of any employee served under paragraph (1) of subdivision (b) of Section 1985.6"].)  The exemption of some kinds of defective subpoenas from a requirement to file a motion to quash implies that such a requirement exists to challenge other alleged defects.

Finally, Myllyla's argument ignores his own conduct in responding to the notice to appear.  Even if Myllyla could have challenged the April 13 notice to appear by simply declining to show up for trial, that is not what he did.[5]  He appeared and testified during the first phase of trial, and then, after losing the verdict, unilaterally decided to absent himself rather than provide testimony about his net worth during the punitive damages phase.  Had Myllyla been present to testify, Plaintiffs could at least have questioned him about his financial circumstances.  He chose to deprive them of that opportunity, and he is therefore estopped from complaining about the lack of evidence of his financial condition.[6]

---

[5] Neither Myllyla nor Plaintiffs address the March 29 notice to appear, which was clearly timely in requesting Myllyla's appearance before the April 17 trial date.

[6] Myllyla's explanation of the reason why he never objected to Plaintiffs' notice is revealing.  He explains that "if he had challenged the subpoena, he may have acknowledged that the subpoena might be [*sic*] in some manner become effective."  It appears that Myllyla adopted a deliberate strategy of declining to

### B. *Substantial evidence supports the jury's finding that Myllyla engaged in conduct warranting punitive damages*

Myllyla claims that the evidence was insufficient to support a punitive damage award. We review the evidence supporting punitive damages under the substantial evidence standard. (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34.)

Punitive damages are permissible on a showing of conduct amounting to "oppression, fraud or malice." (Civ. Code, § 3294, subd. (a).) There was evidence that to avoid inspection of the Building, Myllyla falsely told the Department that he was not renting the Building and that it was occupied only by family members. Myllyla admitted that he lied to the Department to avoid inspection, and that he chose to operate the Building illegally because he "couldn't bring the Building up to code." His fraud in dealing with city regulators directly enabled his violations of habitability standards that led to Plaintiffs' injuries. We conclude that there was sufficient evidence of fraud to support punitive damages under Civil Code section 3294, subdivision (c)(3).

---

raise an objection at trial to avoid any order or finding that could undermine his argument that the notice was invalid. Myllyla's gamesmanship deprived the trial court of the ability to address any claims of *actual* prejudice from the shortened time that Plaintiffs set for compliance with the notice, providing further support for the conclusion that Myllyla is estopped from benefiting from this strategy on appeal.

C. *The punitive damage awards were not excessive*

The only ground that Myllyla presents for his claim that the punitive damage awards were excessive is that he is not a wealthy person. He argues that he "earned his living as an aircraft mechanic, and he had to sell his interest in an airplane just to reinstate the utilities in 2013."

As discussed above, Myllyla forfeited the ability to argue that Plaintiffs introduced insufficient evidence of his net worth. Without such evidence, there is also no basis for Myllyla's argument that the punitive damage award was too high in relation to his financial resources. Myllyla has therefore forfeited that argument as well.

## 2. Sufficient Evidence Supports the Jury's Awards of Noneconomic Damages

Citing selected purported admissions from particular plaintiffs, Myllyla argues that the evidence does not support the jury's award of damages for noneconomic losses. We disagree.

We review the evidence relating to emotional distress damages under the substantial evidence standard.[7] (*Bermudez v.*

---

[7] Myllyla addresses only emotional distress in the context of Plaintiffs' claims for intentional infliction of emotional distress. However, the verdict forms permitted the jury to award damages for a variety of noneconomic losses, including "physical pain, mental suffering, anxiety, stress, indignity, humiliation, and emotional distress." Moreover, in addition to Plaintiffs' intentional infliction of emotional distress cause of action, the jury was permitted to award such damages on Plaintiffs' claims for negligence, breach of implied warranty of habitability, premises liability, negligent failure to provide habitable

12

*Ciolek* (2015) 237 Cal.App.4th 1311, 1324 [an award of damages will not be disturbed if it is supported by substantial evidence].) Under that standard, we " 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.' " (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) Our task "*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted," which will support the verdict. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.) Substantial evidence is any evidence that is " 'reasonable in nature, credible, and of solid value.' " (*People v. Bassett* (1968) 69 Cal.2d 122, 139.)

Myllyla argues that a number of the plaintiffs testified that they experienced emotional distress from events that occurred *prior* to the period covered by the statute of limitations.[8] However, while Plaintiffs could not recover emotional distress damages directly stemming from events outside the permissible dates, the jury could reasonably consider the *effect* of such events on Plaintiffs' sensitivity to conditions in the Building during the statutory period. For example, as the trial court observed in

_____

premises, and nuisance. Because we find that Plaintiffs adequately supported their emotional distress claims, we need not consider whether the noneconomic damages are supported by other types of injury (such as, for example, physical pain and discomfort from insect bites).

[8] The special verdict form instructed the jury on the operative period to consider for each cause of action. The jury was instructed that it could award damages for noneconomic losses from September 14, 2014, to February 26, 2015 (the date Myllyla sold the Building).

13

denying Myllyla's motion for a new trial, the jury could infer that plaintiff Theresa Ramos's traumatic experience in having a cockroach removed from her ear before the statutory period made her more prone to emotional distress from the presence of cockroaches in the Building during the period for which the jury was permitted to award noneconomic damages. (See *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 168 [" '[A] tortfeasor may be held liable in an action for damages where the effect of his negligence is to aggravate a preexisting condition or disease' "].)

As discussed below, the record contains sufficient evidence that each Plaintiff experienced conditions in the building causing emotional distress for which the jury was permitted to award damages.

### Jose Chuc[9]

Jose testified that about 20 people lived in the Building, and they all shared the same bathroom. The condition of the Building was "very bad." The windows were dirty and could not be opened; there were many roaches and rats and bedbugs; and the bathroom was rarely cleaned. Living in those conditions made him "very angry." The conditions affected him "[v]ery badly," but he "didn't have any other way to live elsewhere."

When asked whether his bad feelings went away after the water and power were turned on (i.e., before the statutory period), Jose, answering through an interpreter, said, "Yes." However, in apparent contradiction, he immediately added, "[b]ecause it remains, the discomfort, the anger, and there was

---

[9] Where parties share the same last name, for clarity we refer to them by their first names. No disrespect is intended.

nothing else I could do." He said that his feelings remained "almost since the beginning of 2012 and forward."

**Ofelia Argaez De Chuc**

Ofelia lived in the Building with her husband, Jose. She also testified about the presence of roaches, bedbugs, rats, and cats. She was terrified of the rats.

Myllyla cites one question and answer exchange on cross-examination for the claim that Ofelia disclaimed any basis for emotional distress damages. Myllyla's counsel asked, "[A]s to the emotional disabilities, did you have any emotional disabilities or injuries resulting from anything that happened before Mr. Myllya [*sic*] sold the building in February 2015?" She responded, "No." Counsel then asked, "So you are not claiming damages for emotional distress at this time; is that correct?" She answered, "Yes."

We agree with the trial court that this exchange was ambiguous. Interpreted in the light most favorable to Ofelia, she might have understood the phrase " 'emotional disabilities or injuries' " to refer to a physical condition. And her answer "yes" to the negatively phrased question, "So you are not claiming damages for emotional distress," could have meant that she *did* claim such damages. That interpretation is consistent with Ofelia's clear answer during direct examination that she was in fact "claiming emotional distress as a result of living in that Hartford building."

Ofelia offered further ambiguous testimony during the redirect and recross-examinations concerning her emotional distress. Her testimony suggests that she was confused by the

questions.[10]  We interpret her testimony in the light most favorable to Ofelia as the prevailing party, and conclude that it supports the finding that she suffered emotional distress from conditions in the Building.

**William Garcia**

Garcia testified that he had no screen on his window and the shared bathroom was always dirty.  Water also leaked from the upstairs bathroom.  For a time the toilet clogged two or three times a week.  The bathroom had mold.

The Building had cats, ants, and roaches.  Garcia had to put something under the door to his room to prevent the roaches from entering.  The ants bit him when he was in bed.  Garcia felt sad and angry because of the roaches.  He was embarrassed to live in the Building.

Conditions in the Building prevented Garcia from sleeping well, which affected his work.

Myllyla cites portions of Garcia's deposition read during cross-examination in support of the claim that Garcia's emotional distress stemmed from discrimination rather than conditions in the Building.  However, Garcia explained that the discrimination concerned how Myllyla "had us living there."

**Gilbert Martinez and Barbee Arocho**

Martinez and Arocho lived together in the Building.  They had moved out of state at the time of trial and so testified through their depositions.

---

[10] For example, on redirect counsel asked again if Ofelia was "claiming emotional distress in this case as a result of the defendant's actions."  She answered, "No."  But when counsel asked whether she was  "sure about that," she said, "No."  She then testified that Myllyla's actions made her "upset" and "sad."

16

Martinez testified that, while Myllyla owned the Building, the termite damage was bad enough that, if you leaned on the wood, "your rear end would go through."  There were roaches.

When asked if he suffered "extreme" emotional distress when Myllyla owned the Building, Martinez responded, "Just being worried since the first time we had words about the Building."  He testified that his emotional distress with Myllyla did not continue, but also said that his condition was "just being mad all the time."

Arocho moved into the Building in 2014.  Roaches came out of other rooms and she bought a can of Raid to kill them.  When the water was shut off in 2014, she had to pay Myllyla's daughter, who lived next door, for buckets of water.  When asked if she suffered emotional distress, she responded, "Well, wouldn't you if you have to take a shower in a bucket?"  She was asked again if she suffered emotional distress during that time and responded, "I think everybody did."

**Levi Anonuevo**

Anonuevo had no sink in his room, so he had to wash his dishes outside where "everyone use it."  He had no heat, and therefore supplied his own heater.  The shared bathroom was moldy.  There were fruit flies, bedbugs, and many cockroaches.  He found them on his furniture and in his appliances.  That problem persisted throughout the time he lived in the Building.

The cockroaches and the flies made him "feel sick."  The smell from the cats was "horrifying."  When the water was out, Anonuevo was also forced to buy buckets of water from Myllyla's daughter.

Anonuevo testified that when he was living in the Building, "I was terrified all the time, so I just stay in my room.  I just—

when I go out, I go straight to the store and go back to my room. I don't hang around the house."

**Froilan Hernandez Lorenzo**

Lorenzo washed his dishes outside with everyone else. The shared bathroom was "horrible"—deteriorated and the walls had mold. Water seeped up. There were mosquitoes, flies, cockroaches, and spiders. He testified that he has "a phobia of cockroaches because of how dirty they are—or when you go to sleep, they would come on the bed. And it was like you were terrified because, I mean, they were these big cockroaches. And, you know, that just—you would be under fear all the time because, you know, even if you kept it clean, they would always come back up again." He could sometimes feel the cockroaches on his feet when he was in bed.

On cross-examination, Myllyla's counsel impeached Lorenzo with a portion of his deposition in which he initially testified that his only emotional distress was the inability to sleep well because of the smell of cigarettes. After a break, he then expanded his deposition testimony to include distress from cockroaches, cat noise, and dampness in his room.

As the trial court noted, despite this impeachment, Lorenzo's trial testimony was sufficient to support the conclusion that he suffered emotional distress from conditions in the Building, particularly his traumatic fear of cockroaches.

**Teresa De Jesus Ramos**

After moving into the Building, Ramos noticed the cockroaches. In 2012 or 2013, she had a cockroach removed from her ear. She continued to see cockroaches in the Building after that experience. That made her feel bad. "I was sad. I was frustrated because of all the experiences that I lived there."

There were times when she felt cockroaches walking on her head as she was sleeping.  She sometimes got a rash.  She felt "frustrated" and "helpless."

**Roberto Melendez**

Melendez testified that the bathroom was in a very bad condition.  The toilet was often clogged, and there were "holes that were starting to form on the floor because of the water that was very dirty."  There was a lot of mold.

He, too, paid Myllyla's daughter for buckets of water when the water was out.

Melendez had problems in the Building with cats under the Building, ticks, rats, and cockroaches.  The roaches were there for the entire time he lived in the Building.  He had allergies to the cockroaches, which made him feel "a little bit awful."

As these summaries show, some testimony from some Plaintiffs was ambiguous as to whether they suffered, or were claiming damages from, "emotional distress."  The ambiguities could have stemmed from confusion about the meaning of the term "emotional distress" or what the Plaintiffs' precise legal claims were.  In some cases, the confusion was probably exacerbated by translation difficulties.  However, each of the Plaintiffs testified about his or her negative experiences from conditions in the Building.  The evidence at trial clearly described conditions that would naturally result in emotional distress.  The jury's awards of noneconomic damages for each plaintiff were modest.  We therefore conclude that those damages are amply supported by the evidence.

3. **The Trial Court Acted Within Its Discretion in Declining to Offset Damages with the Amounts from Prior Settlements**

Myllyla argues that the trial court erred in denying his motion to offset the amount of the damages that the jury awarded with sums that other defendants paid in settlement before trial. We review the trial court's ruling declining to offset the damages under section 877 for abuse of discretion. (*Hellam v. Crane Co.* (2015) 239 Cal.App.4th 851, 863.)

Section 877 provides that, where a release or dismissal is given in good faith before verdict to "one or more of a number of tortfeasors *claimed to be liable for the same tort,*" it has the effect of reducing the claims against the others in the amount stipulated "or in the amount of the consideration paid for it, whichever is the greater." (§ 877, subd. (a), italics added.) The trial court concluded that no offset was appropriate in this case because Myllyla was liable for torts different from those the settling defendants allegedly committed.

We find no abuse of discretion in that ruling. The trial court observed that Myllyla and the settling defendants owned the Building during different time periods. Myllyla sold the Building to the settling defendants on February 26, 2015. The operative Complaint alleged that Myllyla and the settling defendants owned the Building at different times. And, crucially, the verdict forms directed the jury to award damages against Myllyla only for the time period in which he owned the Building.

The jury is presumed to follow the directions it is given. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803.) The trial court therefore reasonably concluded that the damages awarded against Myllyla were not for the same torts that the settling

20

defendants allegedly committed. (See *Carr v. Cove* (1973) 33 Cal.App.3d 851, 854 ["Ordinarily, no danger of a double recovery exists where separate tortfeasors cause separate injuries"].)

4.    **Myllyla Has Failed to Show that the Jury's Verdict Was a Result of Misconduct or Unfair Prejudice**

Myllyla makes a perfunctory argument that Plaintiffs' repeated references to him as a liar during trial were improper and must have resulted in unfair prejudice. Myllyla points to no evidence of juror misconduct, and therefore has no basis for an argument that the jury actually reached its verdict through improper means. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1470–1471 [trial court should not have reached the merits of a jury misconduct claim without any admissible evidence of such misconduct].)

We also reject Myllyla's argument that references to him as a liar during trial and argument were unfairly prejudicial. The record shows that he in fact repeatedly lied about relevant facts. Testimony, including Myllyla's own admissions, established that he lied to the Department to avoid inspection of the Building. Myllyla also admitted to lying *during* his testimony at trial. Plaintiffs' references to and comments on this untruthful conduct were therefore supported by the record and were within the fair range of advocacy.

21

**DISPOSITION**

The judgment is affirmed.  Plaintiffs are entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.

22